May it please the Court, Mary Ann Dugan, for the appellant Efrain Reynaga. As you know, there are several issues. With the Court's permission, I would start with the directed verdict issue on the lock-cutting event. There were several really strongly disputed issues of fact that were sufficient to create a jury question. Mr. Martin's locker, he was a white co-worker whose locker was five feet away from Mr. Reynaga's, was called and told that dogs had alerted or hit on or stopped at his locker. The terminology by different witnesses, various witnesses, was different, and that's in the record at ER 78 and SCR 45. And his locker was not – That he stopped, didn't say the dog stopped at his locker. Isn't that what the record shows? That's what Mr. Martin self-servingly testified to, but co-workers testified that they heard that his locker had been alerted on or hit on. Why does that help your argument? Because his locker was not opened. I think the testimony is that, in fact, the dogs didn't alert to his locker. He was told that, and it turns out that wasn't true, and so maybe there would be an inference if the dogs had alerted and the lock wasn't opened. But I think the testimony is uncontested that the dogs did not alert on Martin's locker. Isn't that right? The management testified that the dogs did not alert on his locker, but other – So excuse me for interrupting. Did anyone testify that the dogs did alert, or just Martin saying that he got a call that he was told that? Did anybody testify the dogs alerted? Yes. I can't remember his name. There was a co-worker, and I believe it's either ER 78 or SCR 45. I don't have it right in front of me, but one of those pages is a co-worker talking about that. And the management testified that they were advised – Please tell us what the co-worker said and the page and the record so we can find out if it's accurate what you say. I believe Mr. Martin's testimony might be on page 258 of the transcript. Is that the co-worker that you're mentioning? Oh, the other co-worker, not the one whose locker we're talking about. What I want to know is you say that there was some evidence that the dog did react. Right. Who said that? I do not remember the co-worker's name. I believe it's either at ER 78 or SCR 45. Furthermore, I believe the jury would be entitled to have an inference that if three people are saying that Mr. Martin was called and given a heads up that dogs had stopped at his locker or alerted or hit on, that even if management now says that didn't happen, that the dogs didn't stop, the fact there was a phone call made to Mr. Martin, which is undisputed, saying, hey, dogs stopped at your locker, the jury would be entitled to believe that the dogs did alert at his locker and the locker was not opened. The management testified. I'm mistaken, but I gather that there was a difference between stopped and alerted. That in this case, nobody argues that the dogs did or didn't stop at a certain point, but when they alert, you know what they do and there's no, well, you tell us where in the record we'll find evidence that they alerted at his locker. The pages I cited say that workers were told by other workers or by management that the dogs had alerted or hit on. And then Mr. Martin himself says stopped. The fact that Mr. Martin, who is white and whose locker wasn't searched, is now helping management by saying, oh, no, they didn't say alerted, but other people are saying they did alert, certainly creates a jury question as to who is telling the truth, what actually happened, what the dogs did. The police officers would testify because they were present during part of the search. Management testified that they were advised that if the dogs alerted at a specific spot, they couldn't limit the search. That didn't narrow down the area that was being indicated, that they would have to look at two or three lockers in the vicinity. Mr. Martin's locker was five feet away from Mr. Reynaga's locker. Mr. Reynaga's locker backed up to the locker of Mr. Branagh, his tormentor, and Mr. Branagh's locker was not opened when the dogs allegedly alerted on Mr. Reynaga's locker. And the other workers... The only alerting that management admits to is in front of Mr. Reynaga's locker. It backed up to Mr. Branagh's locker. I think there were two or three people there, including the shop steward, and some of them purported not to remember much at all. And it did take place quite a while before the trial. But to go back to the prior point was that management admitted that they were told if there's an alert, you're supposed to search the entire area, vicinity of two or three lockers, and that they did not open Mr. Branagh's locker, excuse me, nor Mr. Martin's locker. I would like to turn to the issue of the defendant's motion in limine regarding the lock cutting and regarding the dirty jobs that were given to plaintiffs on the lock cutting. This is not a stand-alone, if the directed verdict is upheld, we acknowledge this is not a stand-alone claim for discrimination, but it certainly goes to the pattern of hostile work environment, as the Supreme Court addressed in National Railroad Passenger vs. Morgan. The jury instruction for hostile work environment, which is model number 10.7, is that if the defendant is found guilty of hostile work environment, would require the plaintiff to demonstrate not only that he was subjected to a hostile work environment, but that the management failed to take prompt, effective remedial action that was reasonably calculated to end the harassment. So showing the jury these other events would help them understand the pattern of hostile work environment that was allowed to continue throughout Mr. Branagh's tenure at this company. The pattern is relevant to that, and that's also relevant to our sixth issue, which was the exclusion of evidence of racial statements, racist statements that were not known to Mr. Branagh. Because the jury would be required to find, the plaintiff would be required to demonstrate to the jury that the management failed to address a hostile work environment, the fact that there are other racist statements and events going on, even if Mr. Branagh was not aware of them, is relevant to that second jury issue on hostile work environment. And in the McGinnist case, M-C-G-I-N-E-S-T, this court did not state that all statements have to be made in front of or known to the jury, but it did explain that the plaintiff must demonstrate both objective and subjective hostile work environment. So there's this huge burden on the plaintiff, these cases are very difficult to get to trial, much less win. Part of what the plaintiff must do is show a pervasive pattern, it can't be just isolated events. So to exclude that entire incident where only Mr. If a jury, a jury would be allowed to find that only Mr. Branagh's lawful locker was opened, helps show the pattern of hostility. The records show that certain lockers were locked and certain lockers were unlocked, and the locker where the lock was cut was a locker that was locked, but lockers near it were unlocked, isn't that so? But the evidence, the jury would be allowed to believe the evidence which said that the lockers were unlocked. But none of the other lockers near his were even opened, even though they were unlocked. Furthermore, there's the cutting of the lock itself, which you or I might think of as a minor event, but these are, they're personal locks, they're very, his had his name on it, he took it as an affront that his son who was standing there who shared his locker was not allowed to get his key and unlock the locker where other workers were allowed to go get their keys. It's a little thing, maybe these days we'd call it a microaggression, but it adds to the picture of a hostile work environment. Was there evidence to that last fact, I thought that got wobbly about whether or not the son, forgive me, I forget the son's name, Richard, that Richard offered, said he had the key or could get the key, did he confirm that later? I don't think that is disputed, I think what was disputed is whether other people had their locks cut, there were people, there were, the shop steward and one other witness I believe testified that nobody else had their locks cut. With the court's permission I will reserve the remaining time for rebuttal, thank you. If you may please the court, it's hard to respond to these arguments because there are new allegations. Do you want to state your name? Oh, sorry, Jason Montgomery, attorney for Roseburg Forest Products, and is that better? Okay. It's hard to respond to some of this, there are things that are not in the record, there are things that have not been said in the briefs before that I'm going to try to respond to some of the things that were just said. One is the assertion that Mr. Reynaga's locker was in a bank of lockers, and that in that bank was Branagh's locker, it's not in the trial record anywhere. Appellant's counsel has cited deposition transcripts that did not come into evidence at trial, which are not part of this record, and that those facts are not in the record and should be disregarded. That management knew or had been instructed that the practice was to open surrounding lockers, is that in the record? Yes, I don't know if that's in the trial record, but that's a true statement. My recollection is that the procedure was if a dog alerted in that there was a group of lockers there, all the lockers in that group would be searched, but there's no evidence in this record that Mr. Reynaga's was in a group of lockers or that some of those weren't searched, it's just not in there. So, you know, this stuff about whether there was an alert or whether there was a stop, unfortunately I should have written down the pages, but I went through the reply brief is where this was first cited, and I went through each of them and I sort of categorized what I saw. And what I saw was there were a few statements where witnesses referred to the word alert, but they were all referring to gossip or hearsay. You will not find a single witness in the record who had personal knowledge of this event who says, I saw the dog's alert on Mike Martin's locker. It's all hearsay. Could I ask you to turn to the motion and eliminate regarding the evidence, the testimony that Branagh, is that, am I pronouncing that name correctly, Branagh, that Branagh had a firearm in the workplace? Yes. I'm trying to recall the testimony. I think the question was of Richard Reynaga, have you seen Branagh, or actually it was generally, if I recall, it was have you seen employees with firearms in the workplace? And so I objected to that because one of the themes throughout this trial from an evidence standpoint, it kept coming up was there was an effort to bring in evidence about some employee heard some random racist thing or saw some threatening action, but there wasn't a connecting the dots. There was no evidence to show this was communicated to Efren Reynaga or that he observed it. And I think that, forgive me for interrupting, but I think that's why the district court excluded this under 401, rule 401, and thought it was irrelevant. This was testimony, would have been testimony from the plaintiff's son, that he saw Branagh, that's where the question was heading. What I can't tell is what your response is on this, on relevance. Is it really your testimony that hostile work environment requires that the plaintiff have personally experienced all of these? I think he doesn't have to personally experience, for instance, he doesn't have to have seen Branagh with a firearm. It can be communicated to him. He can learn from another employee, oh, Branagh's packing a firearm around the mill. That would be relevant and admissible because that goes to whether he subjectively had a sense of danger. And this was Richard, his son and a co-worker too, right? He worked there as well? Yes. And so if it's not excludable under 401, what is your position as to why it was properly excluded? Well, I think that is my basis. 401? Yes. I thought you just said it was relevant. Forgive me. I'm losing your string of thought. Okay, my argument is, is because the question was not, I mean, the easy question would have been to get Efren Ranog on the stand and say, Efren, did you ever hear that Branagh was packing a firearm? I would not have objected to that question. Right. But anyway, but the district court was ruling on a different objection and it was Richard on the stand. And you've just told me that you've agreed that the hostile work environment could be established without Efren necessarily seeing that directly. So if it's not a 401 problem, what was the problem with the... I think it's a relevance issue. I mean, that particular question had to deal with whether his son knew of Branagh packing a firearm, but there's no connection to Efren Ranog. So for me, that's no relevant. So you are relying on 401 and it sounds like you are taking the position that the plaintiff has to have personally experienced these things in order for this to establish a hostile work environment, or else I'm missing a distinction you're making. It depends on what you mean by personally experienced. I mean, what I'm saying is he doesn't have to witness the firearm. Who's the he in your sentence? Efren Ranog does not have to see the firearm. He can hear about the firearm. And that was the consistent ruling by the judge throughout this trial. You just have to show that this got communicated to him while he was employed there. Okay. But Richard wasn't even allowed to say that he had seen it. I mean, he didn't even get that far right in his testimony. Was there any attempt by the plaintiff's counsel to make an offer of proof regarding this testimony by Richard? You know, there was an offer of proof of the entire first trial. And I can't recall right now if he testified in the first trial, if he was allowed to testify. I think he was, but that's a little bit of speculation. So there was no specific offer of proof in the second trial. So when I was—I guess I'll get back to the Walker issue, because that's, I think, with the standard we're dealing with, the most important for me. And what I saw in the descriptions of this alert testimony, I think I already said, you know, we had people—it was all hearsay. And so the other thing about the Walker issue is, to show discrimination here, first of all, there were some inaccurate statements about how no other Walker was alerted on. That's not true at all. There was testimony by the main guy running the search, Mr. McAmis, that there were numerous white employees' Walkers that were alerted on and they were searched. And to show discrimination here, you have to show that a similarly situated employee was treated differently and that they had a difference of race, at least at the very outset. That's the threshold. And here there's not evidence of a single white employee who had a Walker on a lock, where the dogs alerted on it, and the lock was not removed. And that's what they had to show. That would be discrimination. If you can show me one, at least it would be disparate treatment, whether it goes to the next level of legal discrimination. Her argument is a little different, right? It's that they knew that if there was an alert, they needed to search the surrounding Walkers, and they didn't search the surrounding Walkers. They only searched Ephraim's Locker. That's her argument. There's no evidence that there were surrounding Walkers around his Locker, or that there were surrounding Walkers that weren't searched. It's just not in the record. All we know is the dogs alerted on his Locker, and that Locker was searched. And we also know that management was actually hesitant to search his Locker because he was a stellar employee. And that's throughout the trial record. They valued him. And they didn't think it was possible he had drugs in his Locker. But they wanted to be uniform. They wanted to make sure they treated everybody the same, so they searched the Locker. So I just don't think there's evidence that he was treated differently than any white employees who were similarly situated. I'm happy to talk about any of these issues. There's tons of them. But I guess I'll kind of talk about the sequestration issue a little bit. And for that, I wanted to emphasize one point I didn't get to in my brief, and that is, if you look at the Supreme Court precedent I've cited, the Perry case, it talks about how there had been this longstanding practice, and it's very common for there to be a sequestration of a witness, even overnight. But it also focused on the fact that it's within the— Counsel, that wasn't argued on opening argument by your opponent. Why are you bringing that up? I just wanted to cover the issues, but I didn't want to just respond to her arguments. If she brings it up in reply, we'll stop her because she didn't bring it up because—unless you want to open up that issue. I'm happy to pass on the issue. I'm happy to do whatever the Court would rather hear about. One of the reasons I'm hitting on some of these issues is because the opening brief did not cite evidence in the record, and then the reply brief did, and so I'm kind of trying to address some things I didn't really have the opportunity to do in the respondent's brief. Your opponent brought up three issues, the directed verdict on lock-cutting, the motion in limine on lock-cutting, and exclusion of evidence of racial statements not known to Raynaga. Those are the only issues that she brought up in oral argument. Okay. So I guess I'll talk then about the lock-cutting and the exclusion of the evidence, which is a different issue. And so my first point on that is if the Court reverses the directed verdict, then obviously that evidence needs to come in. So if the Court does not reverse the directed verdict on the lock-cutting claim, then the Court has, as a matter of law, already ruled, and this Court has upheld, that that was not discrimination. If that is not discrimination, it is actually prejudicial to the defendant to let it in as some sort of evidence that bolsters her hostile work environment claim or her retaliation claim, because if it's not discrimination, how does it help her claim? How does it help her case? So it should be excluded if the Court upholds the directed verdict on the locker search. And I won't reserve any further comments. Your friend says that there are witnesses who have created a tribal issue of fact that has discrimination on the locker. Have you said all you have to say about that? Yes, I think that, I think the only witnesses you'll see there, I think the Court or clerks should look very carefully at everything that's cited and read what's cited, because the evidence does not support her statements. The evidence will reflect that the only percipient witnesses to testify stated that, well, there was one witness, Mike Martin, I disagree with her, Mike Martin did not say the dogs stopped. He couldn't recall, and maybe he wasn't there, he just had received a phone call. The only percipient witnesses to testify all say the dogs stopped at the locker. One locker. At Mike Martin's locker. Right, one locker. Yes, that's correct. And every other citation is to an unknown hearsay declarant. I think there may be one who's a, well, I think there may all be unknown hearsay declarants. So I'll let the Court investigate that. So, yeah, that's my argument on that issue. There's no evidence of an alert, and then I would say even if there was an evidence of an alert, you know, we still don't have enough evidence of a differential treatment given we don't know. Well, if there was evidence of an alert. That's not true. If there's evidence of an alert. If there's no evidence of an alert in front of Martin's locker, the fact that Martin's locker wasn't open is irrelevant. Yeah. Right. So. All right. Thank you. Ms. Dugan. Thank you, Your Honors. First, I wanted to note that in the brief, I have a page cited incorrectly regarding management being told that if a dog alerts, they must search the whole area. I wrote page 261 of the transcript, and it's page 361, which is at SER 54. Also, I cited page 258 of the first trial transcript. I have now realized that doesn't seem to be in the excerpt of the record, and I don't know if the court would allow me to submit that as a one-page supplemental, but I could do that this afternoon if the court will allow me. It is cited in the brief, the page number in the transcript, but it's not in the excerpt. So I don't know if I can submit that today to complete the record. Go ahead. Thank you. Regarding the stopped versus alerted, I think a jury would question, why would management call Mr. Martin to tell him dogs stopped there and not call Mr. Reinaga and tell him dogs alerted at his locker? That alone, that action by management that benefits Mr. Martin, arguably, is suspect. Regarding the firearm issue, I was not allowed to proceed with my questioning of Richard Reinaga about his knowledge and so could not get to the point of saying, did you tell your dad? You make an offer of proof that Richard Reinaga, if able to testify, would testify that he told his father that Branagh had a gun. I did not, Your Honor. And in the brief, in the reply, I cited case law that I believe would indicate that there's not an offer of proof needed for that type of objection. You don't make an offer of proof every time the court sustains an objection. If Richard Reinaga knew they had a firearm, how does that affect Plaintiff Reinaga unless he knows that fact? Well, I mean, they go to work together. They went to work together when Mr. Branagh was there, when he wasn't supposed to be working with them, and they left. And that helps explain to the jury why they left. Thank you, Your Honors. Thank you. The case of Reinaga v. Roseburg Forest Products is submitted. And the court thanks counsel for their argument.
judges: Farris, Bea, Christen